Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAY ROBERT DARLING,

    Defendant.                          /

Case No. A02-0084 CR (RRB)

IMPOSITION OF SENTENCE
TRANSCRIPT OF PROCEEDINGS

Pages 1 - 28, inclusive

BEFORE THE HONORABLE RALPH R. BEISTLINE
United States District Court Judge

Anchorage, Alaska
April 10, 2003
1:30 p.m.

A P P E A R A N C E S :

For Plaintiff:  CRANDON RANDELL
                AUDREY J. RENSCHEN
                Assistant U.S. Attorney
                222 W. 7th Avenue, #9, Rm. 253
                Anchorage, AK 99513
                Ph: 271-5071

For Defendant:  SUE ELLEN TATTER
                Assistant Defender
                745 W. 4th Avenue, Suite 230
                Anchorage, AK 99501
                Ph: 646-3600

Also Present:   Jay Robert Darling
                Barbara Nichols

Transcribed by: Leonard J. DiPaolo,

PENINSULA REPORTING     907/283-4429
110 Trading Bay Drive, Suite 100    Kenai, Alaska  99611

bd85c847-7eb2-40a5-b7a3-bf01c2eea132

Page 2

```
 1            TABLE OF CONTENTS
 2   WITNESSES:       DIRECT  CROSS  REDIRECT  RECROSS
 3   FOR THE PLAINTIFF:
 4   None
 5
     FOR THE DEFENDANT:
 6
     Leon Hammer
 7      (Statement)      6
 8   EXHIBITS:           OFFERED    ADMITTED
 9   FOR THE PLAINTIFF:
10   None
11   FOR THE DEFENDANT:
12   None
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           PROCEEDINGS
 2   Courtroom 3-Anchorage 4/10/03
 3   1:30:23
 4       THE CLERK: All rise. His Honor the Court, the United
 5   States District Court for the District of Alaska is now in
 6   session. The Honorable Ralph R. Beistline presiding. Please
 7   be seated.
 8       THE COURT: Good afternoon. Everybody ready to proceed?
 9       MR. RANDELL: Yes, Your Honor.
10       THE COURT: Okay, we're on the record, United States of
11   America versus Jay Robert Darling. It's case A02-0084-0001
12   criminal. Mr. Darling is here with counsel. We've got
13   Government counsel here. Probation officer is here. So it
14   looks like we're all ready to proceed.
15       Prior to coming in today I was able to review the file
16   again and receive the supplemental exhibits, the photographs,
17   the letters, and the reports that were filed on Defendant's
18   behalf, so I think I have all the information available to me.
19       So Mr. Darling, on January 24th you entered a guilty
20   plea in which -- to Count V, and that was mail fraud, you know
21   that, right?
22       MR. DARLING: Yes, sir.
23       THE COURT: And your understanding was that the Government
24   would dismiss Counts I through IV after the sentencing. That
25   still is the agreement of the parties, is that true?
```

Page 4

```
 1       MR. RANDELL: Yes, Your Honor, it is.
 2       THE COURT: At that time the Court ordered a presentence
 3   report. That has been prepared and the Court has had a chance
 4   to review it as well as the objections. Mr. Darling, have you
 5   had a chance to review the presentence report?
 6       MR. DARLING: Yes, Your Honor, I have.
 7       THE COURT: Were you able to discuss it with your
 8   attorney?
 9       MR. DARLING: Yes.
10       THE COURT: Okay. Any questions about the presentence
11   report, Mr. Darling, at all?
12       MR. DARLING: No, sir.
13       THE COURT: Okay, well, I've reviewed it in some detail.
14   I note that the Defendant submitted several written objections
15   to the presentence report, and that some modification was made
16   as a result of that. I also note that there was a dispute with
17   regard to the two level upward adjustment for obstruction of
18   justice as a result of the phone conversation, I think, of
19   October 15th at the Sea-Tac Federal Detention Center.
20       I've studied all that, and frankly it appears that the
21   presentence report was accurate with regard to paragraphs 10,
22   15 and 16, and that the statements contained therein were
23   supported by reasonably reliable information. I also note that
24   none of the information in those three paragraphs is important
25   to the sentencing determinations, since no changes need to be
```

Page 5

```
 1   made to the report.
 2       I think that Defendant's argument with regard to the
 3   obstruction of justice adjustment was well taken. I looked at
 4   that in detail. I note also that the Government acquiesced to
 5   the argument. Although I'm not particularly pleased with the
 6   attitude expressed by Mr. Darling on the telephone, it's not --
 7   I think it is too much of a stretch to presume that these
 8   comments to a friend constitute obstruction of justice,
 9   primarily because he was not advocating any illegal conduct or
10   making any threats.
11       On the other hand, I think that I can consider that
12   conduct, along with everything else, in determining where
13   within the applicable guideline range the sentence should fall.
14       So after reviewing the presentence report, I feel
15   comfortable in accepting the plea agreement. It appears that
16   Mr. Darling should be sentenced, and it appears that everyone,
17   the Government and the Defendant agree, that he should be
18   sentenced pursuant to the Sentencing Guidelines at Offense
19   Level 20, in a criminal history category of 1, giving a
20   sentencing range of 33 to 41 months. Having said that, I'm
21   prepared to listen to the arguments of counsel.
22       MS. TATTER: Your Honor, before we have arguments, I ask
23   the Court's consideration. Mr. Leon Hammer, who wrote a letter
24   to the Court, is here. He came up here and he was able to
25   support Jay, and I would ask the Court to take some testimony
```

2 (Pages 2 to 5)

PENINSULA REPORTING    907/283-4429
110 Trading Bay Drive, Suite 100   Kenai, Alaska  99611
bd85c847-7eb2-40a5-b7a3-bf01c2eea132

Exhibit D - Page 2 of 8

Page 6

1  from him briefly on the issue of where in the guideline
2  range --
3       THE COURT: Where?
4       MS. TATTER: He's here.
5       THE COURT: He wants to -- you mean, what, to tell me
6  where I think what I should rule?
7       MS. TATTER: No, just what his experience with Jay has
8  been in terms of community service.
9       THE COURT: This is his brother -- no, this is --
10      MR. DARLING: He's a friend.
11      THE COURT: This is his friend, the Scout friend?
12      MS. TATTER: Right.
13      THE COURT: Okay. There is a microphone. If you can just
14 give us his name. I've read your letter, sir, so I've had the
15 benefit of your letter.
16      MR. HAMMER: Thank you. Leon Hammer.
17      THE COURT: And you want to make a statement, that's fine.
18      THE CLERK: Could he please state and spell his name?
19      THE COURT: Could you state and -- he did state his name.
20 But spell your last name for the record, please.
21      MR. HAMMER: H-a-m-m-e-r.
22      THE COURT: So it's Leon Hammer?
23      MR. HAMMER: Correct.
24      THE COURT: Okay.
25      MR. HAMMER: I'm here just on behalf of Jay to show

Page 7

1  support as a friend. Jay has been a good friend to me as far
2  as family. I've got to know him as an assistant Scout master
3  to me when I was called to be a Scout master. Jay has been a
4  very good friend for me and to my family. He has come in and
5  been a part of our family for many outings. He has also been a
6  close friend of mine as we have traveled across five different
7  states on a trip while I was out on sabbatical from work.
8       I feel that Jay is moving in a direction that is
9  positive in his life. I've only known him for a short time. I
10 do not know the individual that is being tried here as far as
11 for the crimes that he's committed, but the individual that I
12 have seen and known I feel is an individual that is worth being
13 a friend to. And me and my family are looking forward to the
14 day that he is released and to bring him back in as a friend to
15 our family.
16      THE COURT: Very good, thank you. Any other witnesses?
17      MS. TATTER: No.
18      THE COURT: Okay, so then I'll hear the arguments of
19 counsel. Let's see, we'll hear first from the Government.
20      MR. RANDELL: Thank you, Your Honor. I want to address
21 the psychological evaluation first. And I want to note at the
22 outset that -- one of the statements made by the psychologist
23 reads as follows: I find nothing in Mr. Darling's background
24 to suggest that he has Antisocial Personality Disorder, or that
25 he's a danger to other people. He does not have the usual

Page 8

1  criminal -- the usual history of criminal offenses and other
2  antisocial behavior.
3       We have to keep in mind that the doctor in this case
4  was only supplied with certain materials. He was not supplied,
5  for example, with the 36 recorded phone calls conducted by Mr.
6  Darling over the jailhouse phone.
7       There was a detention hearing in this case, in this
8  building, back on October 24th, and I imagine that this Court
9  is not aware of the events and the testimony taking place at
10 that detention hearing. But I have done a few little snippets
11 here from that detention hearing at which Mr. Darling was
12 present and Ms. Tatter.
13      And at that detention hearing a State trooper
14 testified, and he testified concerning his contact with certain
15 people known by Mr. Darling, people that were on a more
16 intimate basis with Mr. Darling than, say, the psychologist.
17      And one of the people that this State trooper talked
18 to was Mr. Darling's uncle, who is a gentleman by the name of
19 Mr. Caulder (ph). And apparently Mr. Darling lived with Mr.
20 Caulder for a period of time, from March 1998 until February of
21 1999, and that period of time was after this particular event,
22 which took place back in 1997. And Mr. Caulder had some things
23 to say about Mr. Darling at the time that he was living on his
24 property in Oregon, Tigard, Oregon.
25      And the trooper was asked if there was an episode that

Page 9

1  Mr. Caulder related to you about a Christmas gift coming to Jay
2  Darling from Jay Darling's grandfather through Mr. Caulder.
3  And the uncle indicated, yes, Mr. Caulder's father sent Mr.
4  Darling a check for $500 for Christmas. This presumably would
5  be Christmas of 1998. Mr. Caulder received it earlier than
6  Christmas and was instructed to buy Mr. Darling a gift with
7  that instead of giving him the money. Around the 15th of
8  December of that year Mr. Darling became very upset with Mr.
9  Caulder because he would not give him the check or the cash for
10 it. And they saw --
11      MS. TATTER: Judge, I have to object at this point, I'm
12 sorry to interrupt. But this was contested material at the
13 preliminary hearing. I sent an investigator to Oregon that got
14 all the paperwork from this case. It's our belief -- and if I
15 had known this was an issue I would have brought the
16 investigator who went. But there was a lot of family trouble.
17 Mr. Caulder was a very cranky man who didn't get a long with
18 his neighbors and made lots of complaints.
19      The Prosecutor didn't add this to the presentence
20 report, he didn't put it in his brief. So we're unprepared to
21 rebut this, which we believe we could rebut.
22      MR. RANDELL: But we didn't know that the friend was going
23 to be testifying either. And in light of this psychological
24 report, which we just got within the last week, I think the
25 Court has the right to hear some countervailing information

Page 10

1  that the psychologist certainly wasn't aware of, and you can
2  consider it for whatever value you think it's worth.
3       THE COURT: Well, I know that there was hard feelings
4  between Mr. Darling and Mr. Caulder. And I know that Mr.
5  Darling hasn't been an angel all his life. I don't think I
6  need to rehash everything that went on before.
7       MR. RANDELL: Well, what I'm indicating, Your Honor, is
8  simply that this psychologist was not in a position to -- he
9  didn't have enough information.
10      THE COURT: I looked at what he based his -- I reviewed
11 his report in detail.
12      MR. RANDELL: All right.
13      As limited as the psychological report is, seeing how
14 it was based on a very limited amount of materials, not
15 including interviews with family members, friends of Mr.
16 Darling, acquaintances of his, or knowledge of any of those
17 phone calls we talked about, one of which -- part of which made
18 it into the presentence report -- in spite of all of that, I
19 don't see how this psychological evaluation helps him at all,
20 actually, even with the limited materials provided.
21      What the psychologist concluded was that Mr. Darling
22 is very smart, okay. Well, that doesn't help. He also
23 concluded that he has Attention Deficit Disorder, and that
24 doesn't help him either, because there are a lot of people in
25 this world that have Attention Deficit Disorder and don't

Page 11

1  commit mail fraud. He cited no studies or no correlations
2  where there is a relationship between ADD and lying and
3  cheating, committing fraud, that's not there.
4       We talked about the background and his opinion that
5  he's not antisocial, but he doesn't have enough information
6  really to come to that conclusion. He says he does not have
7  the usual history of criminal offenses. Well, does that mean
8  he's not antisocial? Not necessarily.
9       He does say, somewhat interestingly, that this
10 depression, which apparently is another condition that Mr.
11 Darling suffers from, was not caused by the death of his wife.
12      He points out in his evaluation that Mr. Darling has
13 problems in attachment -- that's on the last page -- that his
14 problem is attaching himself to women presumably in any
15 meaningful way. And he concludes that, given his problems with
16 attachment, and the relatively limited time that he was married
17 to Wanda Darling, I suspect that the loss of his friend, wife,
18 was not the overriding cause of his depression. Apparently Mr.
19 Darling's been depressed for a long time. Of course, that's
20 not an excuse for mail fraud, either, any more than ADD is. So
21 I don't think the psychological evaluation is of much
22 assistance to the court.
23      Looking at the offense itself and addressing the issue
24 of where in the range Mr. Darling belongs, I would suggest that
25 this case, this fraud, is not your run-of-the-mill mail fraud.

Page 12

1  This is a very, very special kind of fraud, and a very, very
2  special case.
3       The plan here, this particular fraud, was to defraud
4  an insurance company of death benefits. That was the program,
5  to collect death benefits by perpetrating fraud from an
6  insurance company.
7       If problem is that insurance companies don't pay out
8  death benefits unless somebody dies. So that poses a little
9  bit of a problem. So in this particular case, and what makes
10 it so special is that in order to defraud the insurance company
11 as Mr. Darling has agreed he wanted to do, he had to produce a
12 body.
13      Now you've got two options -- or he had two options,
14 one of which he talked about for a long period of time, and
15 that was to fake his own death. That would be a disappeared
16 body, a body has to vanish, can't find it.
17      The problem with that is, his plan that he talked
18 about for a long time, the problem is that there are a lot of
19 logistical difficulties with that. You have to uproot yourself
20 from your community, you can't hang around at the pool hall if
21 you're dead, you have to separate yourself from your family,
22 which would be hard for most people, completely remove yourself
23 from the area where you used to live.
24      You have to have a wife, and if you have a wife who is
25 going to collect these death benefits, which was Mr. Darling's

Page 13

1  plan, that means that she's got to spend a long period of time
2  in isolation while the insurance company decides whether or not
3  the guy really is dead, because they are not going to pay out
4  the benefits unless they think that Mr. Darling is dead, which
5  is more than missing. So we'd be condemning the wife to a life
6  of isolation and loneliness while he's off somewhere else,
7  presumably trying to support himself until the death benefits
8  comes through. It's very complicated, very complicated, not an
9  easy thing to pull off, and probably not an easy thing to
10 convince your wife of.
11      So we know about the plan, that's in the presentence
12 report, and that's not contested; we know we had a marriage in
13 April of 1997 between Mr. Darling and his wife; and we know
14 immediately after the wedding, right after the marriage, this
15 guy loaded up on life insurance, a policy for him and a policy
16 for her, and lied to get the policies. He wanted life
17 insurance on himself and on his wife, first priority, and lied
18 to do it.
19      Then, only a month or so after this life insurance
20 policy was approved, I believe that was in July of 1997, it
21 wasn't but a month later that he's up here with the wife in
22 Alaska and she dies in a sudden and mysterious death in a
23 plunge off a thousand foot cliff. And I say mysterious because
24 there were no witnesses to this, except for Mr. Darling. And
25 it's mysterious because most people don't plunge off thousand

Page 14

1  foot cliffs, I mean it's not an everyday occurrence, but yet it
2  happened here, clad and clothed in her panties and her bra,
3  that's what she was wearing when she hit bottom.
4      The day following this plunge, this horrific death,
5  the next day he's on the phone. He's on the phone to the
6  insurance company wanting to know where the policy is, the
7  policy that's going to pay him whatever it is, $500,000,
8  because she's dead at the bottom of the cliff.
9      And remarkably, but maybe not so remarkably, while
10 he's on the phone to the insurance agent talking about where
11 his life insurance policy is on his dead wife, he doesn't tell
12 the agent that she's dead.
13     The primary importance here was getting the policy and
14 getting the money. It's all about money and it's all about
15 greed. And I would suggest to you that because of these facts
16 and because of the remarkable circumstance or the remarkable
17 fact of the necessity of a body in this case, which we have,
18 that Mr. Darling belongs at the top of the range.
19     And then add to that something that you noticed just a
20 few minutes ago, his attitude towards this, and what we see in
21 the presentence report about him trying to muzzle potential
22 witnesses in this case. He's telling a friend of his to
23 contact potential witnesses and telling them to keep their
24 mouth shut, because if they don't say anything then that can't
25 be used against him, that's what he says. And if they do say

Page 15

1  something, as he says, right on the tape, on the paper, he
2  could spend the rest of his life in prison, which, of course,
3  would be a serious concern.
4      So I think when you take the conduct, the facts around
5  the case, the offensive conviction, and his attitude towards
6  this, and what he tried to do, not obstruction, but helping
7  himself, he belongs at the top of the range. 41 months is not
8  too much to ask of Mr. Darling due to the facts of this case.
9      THE COURT: All right, thank you.
10     MR. RANDELL: Thank you.
11     THE COURT: Ms. Tatter.
12     MS. TATTER: Judge, the decision is between 33 and 41
13 months, and the Prosecution is saying, well, he should be at
14 the high end because we really suspect him of a homicide, and I
15 think that's what he's saying when he talks about the
16 mysterious death, in spite of the fact that a lengthy
17 investigation was carried out by the State troopers, most of
18 which was directed to trying to get Mr. Darling's friends and
19 acquaintances to say bad things about him all over the country,
20 the District Attorneys and apparently the Prosecutors
21 relentlessly refused to prosecute him for a homicide, a benign
22 autopsy report, and numerous witnesses, which were available to
23 us because there was a big State Farm investigation, numerous
24 witnesses to his genuine distress at the moment he reported the
25 death, including an emergency room doctor, a minister, and

Page 16

1  other people in Homer, to the extent that he threw up in his
2  grief when he reported this, we got to see all the
3  investigation through this. And it's apparent that nobody even
4  thought they could bring a homicide case, and yet the
5  Prosecution is saying, "speculate about what happened and put
6  him at the high end of the range". I don't think that is a
7  good or defensible reason for putting him at the high end of
8  the range.
9      The report by Dr. Parker shows three important things:
10 One, a high intelligence; two, documented ADD, Attention
11 Deficit; and three, documented and severe depression of long
12 standing. And these are problems that he has that explain some
13 of his hair-brained, abrupt behavior.
14     This was a dumb scheme. He made a lot of dumb remarks
15 to the FBI, to his friends on the phone. He does things
16 without thinking them through, as many people with ADD do, and
17 I think his mental problems that Dr. Parker described explain
18 attitudinal things, frustration, anger, goofy behavior,
19 get-rich-quick schemes. But they also carry some hope for the
20 future in the hope that Mr. -- the subtle hope, the good hope
21 that Mr. Darling can become a productive citizen.
22     Depression and ADD can be treated, they can be
23 medicated. One of the things Dr. Parker says is he should have
24 been taking Ritalin regularly, and these are things that are
25 human mental problems, but they are not moral problems, they

Page 17

1  are problems that can be treated. And I think that Mr.
2  Hammer's description of a man who is working with young Boy
3  Scouts, who is a good companion in the out-of-doors, wholesome
4  activity, shows that there is hope, that these mental problems
5  that Mr. Darling has suffered don't have to define him for the
6  rest of his life, and that he can leave prison with hope to be
7  a good citizen, with real constructive -- he is smart, he's
8  just never gotten anywhere because of these mental problems
9  that are documented. He's not faking them. Dr. Parker and the
10 Social Security Administration are very clear that he has
11 these, depression and ADD.
12     He has a positive future. And this is a case, which
13 if you take out the speculation and the suspicion of the
14 alleged homicide, is a pretty dumb scheme to defraud. I'm
15 reminded of other ones such as the World Plus scheme where
16 there were millions of dollars actually lost. This was
17 certainly inconvenience and difficulty to the insurance
18 company, but there was never a dime paid out other than to
19 Wanda Woods' parents, I believe.
20     So the two things that should put him at the low end
21 of the range are the hope for the future and the fact that he
22 has the tools to become a good citizen, and he was already
23 starting to do that before his arrest in the six or so months
24 he was involved with Mr. Hammer and the Boy Scouts.
25     And absent the suspicion and speculation, this is not

Page 18

1  a horrific mail fraud scheme in the mail fraud universe, it's a
2  hair-brained scheme that didn't work.
3       Moving on to the situation of prison, I'm going to ask
4  the Court to strongly recommend the Sheridan facility because
5  it's close to the Hammer family and close to Mr. Darling's
6  sister, who would both be able to visit him. And I'm going to
7  ask the Court to recommend a drug and alcohol program, or any
8  program that Mr. Darling can get into -- I think he needs
9  introspection and focus -- and he's able to get something out
10 of these programs. He had two alcohol-related misdemeanors in
11 the past, and that shows that he certainly has the lurking
12 problem. So I'm going to ask for a recommendation for
13 Sheridan, and a recommendation for the DAP, or other programs,
14 to assist his rehabilitation. He will come out of prison, and
15 I think he should come out in the best way to become a good
16 citizen.
17      THE COURT: All right, thank you. Mr. Darling, you are
18 entitled to speak before I impose sentence.
19      MR. DARLING: Stand up?
20      THE COURT: No, whatever you're comfortable. I don't care
21 if you stand or not, you're fine, just as long as the
22 microphone is close enough.
23      MR. DARLING: After listening, I guess the first thing I'd
24 like to say is I'd like to apologize to, I guess, the people
25 that listen on the phones, to anybody that's had to tolerate my

Page 19

1  angry outbursts. I feel kind of bad because -- I've been
2  trying pretty hard prior to -- prior to my arrest to control my
3  language and not react so angrily and so quickly to input,
4  information I get.
5       The FBI and the investigators have come and taken your
6  phone list and now they are contacting the people on your phone
7  list. That made me angry, and without thinking about it I just
8  reacted, "hey, you know, tell my friends to say nothing."
9       Like I said, I apologize. I was taking some pride in
10 the fact that my language wasn't quite so bad prior to my
11 arrest. And I am conscious of it. Despite the fact that it
12 still happens, I'm trying to correct it, and that's my attitude
13 also. I'm trying not to be quite so angry or to react.
14      I feel very bad. I feel ashamed that Mr. Hammer has
15 to see me here in disgrace that I've brought on myself. I've
16 just made some horrible choices. And I think it was kind of
17 explained to me by a friend who said we come into this life
18 with a God-shaped hole in our heart and we fill it with
19 everything but God. And that's what I've done. That's what I
20 did for always, until recently, until last year.
21      I don't know what the future holds exactly. I know
22 that I'm embarrassed by all this. I just destroyed any kind of
23 positive reputation or possibilities that I might have had
24 otherwise. But I'm going to do my best when I get out to avoid
25 the same kind of thinking that led me here, I finally think I

Page 20

1  know how to do that. But mostly I just wanted to apologize to
2  my friend and the people who have been badly affected by my bad
3  decisions.
4       THE COURT: Okay.
5       MR. DARLING: Thank you.
6       THE COURT: All right, thank you. Let me assure you
7  you're not here today because of any language that you may have
8  used, nor are you here because you may have lost your temper.
9  You're here to be sentenced for the crime of mail fraud, using
10 the United States mail to attempt to defraud an insurance
11 company as a result of or in relation to your wife's death.
12 You've admitted this.
13      Some people think that you murdered your wife. I
14 don't know, it's not for me to say, and that's not why we're
15 here today. It's not a factor in what we're doing.
16      It's clear, though, that your choices were motivated
17 by greed, that you utilized premeditation to defraud the
18 insurance carrier. You're an intelligent person, you're an
19 educated person, you knew what you were doing. There is no
20 excuse for your conduct, no justification.
21      I think the telephone conversation at Sea-Tac -- I
22 don't care about the language you used, I guarantee you I've
23 heard way worse than that -- but it suggests a lack of remorse,
24 and to some extent even a culpable attitude.
25      I look at the letters from your brother and from your

Page 21

1  friends, and it just suggests to me that you're capable of
2  fooling people. And I even looked at these pictures on your
3  Boy Scout outing, and as I looked at those, I thought, boy,
4  appearances can be fooling. Outer appearances are not what you
5  are judged by, you're judged by who you are and what you've
6  done, and that is not reflected in the photographs that I saw
7  or in the things that you might have fooled your family into
8  thinking.
9       I looked at the psychiatrist's report. You had an
10 other than honorable discharge from the service, you had 35
11 jobs in 25 years. You haven't had a pattern of good decisions
12 in your life, you've apparently had a pattern of bad decisions
13 in your life.
14      We know you're a thief. We know that it appears that
15 you can manipulate people, because I think that you have good
16 people thinking you're a good person and you're not. And you
17 have done some things to suggest that you're really a thief and
18 a manipulator, two-faced.
19      And when we talk about your hope for the future, how
20 can I judge the future other than by the past? You know, we
21 have your psychiatrist telling us what has occurred in the last
22 25 years. We know a little bit about your criminal history.
23 We certainly know about the crime that you've admitted,
24 suggesting all that -- you have a life full of poor decisions,
25 no roots, no stability, and you tend to take advantage of

6 (Pages 18 to 21)

PENINSULA REPORTING   907/283-4429
110 Trading Bay Drive, Suite 100   Kenai, Alaska   99611
bd85c847-7eb2-40a5-b7a3-bf01c2eea132

Exhibit D - Page 6 of 8

Page 22

1  people, maybe gain their sympathy, portray yourself as some
2  kind of innocent person that needs help.
3       Your ADD doesn't justify your conduct. Many, many
4  people suffer from those conditions and do very, very well.
5  Your periods of depression do not justify your conduct. Many
6  people, 40 percent of the population I'm told suffer from
7  depression. They don't go steal from insurance companies and
8  defraud.
9       The difficulties that you have had in your life are no
10 greater or no less probably than the average person who does
11 not commit crimes. You simply have, for whatever reason,
12 chosen a path that's led you right exactly to where you sit
13 today. No excuse, no justification.
14      I think you should be sentenced at the upper level of
15 this range simply because you made a premeditated, thoughtful
16 decision and you acted upon it, and have demonstrated little or
17 no remorse, at least up until now. Of course everyone is sorry
18 at sentencing, I mean I know that.
19      I don't know what your future is. I don't know why --
20 I don't know if there is any reason to believe that once you're
21 out of jail and the pressure of this is over with that you
22 won't revert to your old self. Maybe you will, because there
23 is hope for everybody, but, you know, I'm not sentencing you
24 today based on your hope for the future, I'm sentencing you
25 today based on the actions of the past.

Page 23

1       The recommendation that you have drug treatment, I
2  don't see any basis for that. In fact, I look at your
3  psychiatrist's report and it says that, although you've tried
4  some drugs five years ago, marijuana, you told him at least
5  that you didn't have any interest in them and that you don't
6  even like drugs. So it appears that your problems are not drug
7  or alcohol motivated.
8       There is something about who you are, the way you
9  think, the decisions you make that cause you to make the
10 decisions you do and have led you to this position. So I'm
11 going to sentence you to 40 months and I'm going to read the
12 judgment officially now.
13      Pursuant to the Sentencing Reform Act of 1984, it is
14 the judgment of the Court that the Defendant, Jay Robert
15 Darling, is hereby committed to the custody of the Bureau of
16 Prisons to be imprisoned for a term of 40 months. Upon release
17 from imprisonment the Defendant shall be placed on supervised
18 release for a term of three years. Within 72 hours of release
19 from custody of the Bureau of Prisons the Defendant shall
20 report in person to the probation office in the district in
21 which the Defendant is released.
22      While on supervised release the Defendant shall not
23 commit another federal, state or local crime, shall not possess
24 a firearm or illegal controlled substance, and shall comply
25 with the standard conditions that are included in the judgment

Page 24

1  issued by the Court.
2       Additionally, as the offense occurred after the
3  effective date of the Violent Crime Control and Law Enforcement
4  Act of September 13th, 1994, and the Court finds there is a
5  risk of future -- well, I'm sure not sure there is a risk of
6  future substance abuse, I'm not certain about that. I don't
7  mind, by the way, if you have this treatment while you're
8  incarcerated, however I don't see an overwhelming need for it,
9  but I think it's appropriate that you refrain from an unlawful
10 use of controlled substances and that you submit to drug tests
11 upon request of your probation officer as they feel
12 appropriate, as he or she feels appropriate.
13      You should also comply with the following conditions.
14 Number one, in addition to submitting to drug testing in
15 accordance with the Violent Crime Control and Law Enforcement
16 Act of 1994, at the discretion of the probation officer the
17 Defendant shall participate in a program approved by the United
18 States Probation Office for substance abuse treatment, which
19 program shall include counseling and/or testing to determine
20 whether the Defendant has reverted to the use of drugs or
21 alcohol.
22      Let me clarify that. You need to be evaluated. If
23 the evaluation suggests there is a problem, then you need to be
24 treated. The only thing I have before me suggests that there
25 is not a problem based on what your psychiatrist learned from

Page 25

1  interviewing but, but if there is a problem, you obviously need
2  to be treated. I don't care if that occurs in custody or out
3  of custody.
4       Number two, the Defendant shall submit to a
5  warrantless search of person, residence, vehicle, office, place
6  of employment and/or business at a reasonable time, and in a
7  reasonable manner, based upon a reasonable suspicion of
8  contraband or evidence of violation of a condition of release.
9  Failure to submit to a search may be grounds for revocation.
10 The Defendant shall not reside at any location without having
11 first advised other residents that the premises may be subject
12 to searches pursuant to this condition.
13      The Defendant shall participate in and fully comply
14 with either or both inpatient or outpatient mental health
15 program approved by the United States Probation Office, and
16 that's where I think the focus is going to be, because I think
17 there's something not quite in line upstairs that has led you
18 to where you are today.
19      Number four, the Defendant shall not possess a
20 firearm, destructive device, or other weapon.
21      The Court finds that the Defendant does not have the
22 ability to pay a fine. It doesn't -- I can't think of any down
23 side to a recommendation that you serve your sentence, I think
24 it was at Sheridan, is that what I heard you say, Ms. Tatter?
25      MR. DARLING: Yes.

Page 26

1  MS. TATTER: Yes.
2  THE COURT: At the Sheridan facility because I don't think
3  there is anything -- I mean, if you can have access to friends
4  and to relatives that might somehow help you, there is no
5  problem with that.
6      It's further ordered that the Defendant shall pay to
7  the United States a special assessment of $100 which will be
8  paid immediately to the Clerk of Court.
9      Now in this particular case there was a plea
10 agreement; however, I do need to advise you what appeal rights
11 in your plea agreement you waived your right to appeal. Let me
12 read this to you.
13     You're advised that there is ordinarily a right to
14 appeal a sentence even if one pleads guilty, but you waived
15 your right to appeal. Such a waiver is generally enforceable.
16 If you believe the waiver is unenforceable or inapplicable,
17 then you can present that issue to the appellate court by
18 taking an appeal. Any appeal must be taken within the 10-day
19 time period allowed by Rule 4B of the Federal Rules of
20 Appellate Procedure. If you cannot afford to pay for an
21 appeal, you may ask to appeal at public sentence by applying
22 for leave to proceed in forma pauperis.
23     If you request it, the Clerk of Court will file a
24 Notice of Appeal on your behalf. I think that takes care of
25 everything. Is the Government prepared to dismiss the

Page 27

1  remaining charge -- counts at this time?
2  MR. RANDELL: We are, Your Honor. We would move to
3  dismiss Counts I through 4 of the indictment.
4  THE COURT: I presume there is no opposition. There being
5  none, then those counts will be dismissed.
6  MR. RANDELL: Thank you.
7  THE COURT: We've imposed a sentence. Anything else that
8  we need to do today?
9  MR. RANDELL: No.
10 THE COURT: Ms. Tatter?
11 MS. TATTER: No. We're going to pay the special
12 assessment today.
13 THE COURT: Very good. Thank you very much.
14 THE CLERK: All rise. This matter is now adjourned. This
15 court now stands in recess until 3:00 p.m.
16     (Proceedings concluded at 2:09 p.m.)
17 2:09:28
18 Courtroom 3-Anchorage 4/10/03
19
20
21
22
23
24
25

Page 28

1  CERTIFICATE
2  I, LEONARD J. DiPAOLO, Registered Professional Reporter
3  and Notary Public in and for the State of Alaska, do hereby
4  certify:
5      That the tape recording, CD #Courtroom 3-Anchorage
6  4/10/03, was transcribed under my direction by computer
7  transcription; that the foregoing is a true record of the
8  testimony and proceedings taken at that time to the best of my
9  ability; and that I am not a party to nor have I any interest
10 in the outcome of the action herein contained.
11     IN WITNESS WHEREOF, I have hereunto set my
12 hand and affixed my seal this        day
13 of          , 2006.
14
15
16
17 LEONARD J. DiPAOLO
   Notary Public for Alaska
18 My Commission Expires: 2-3-2008
19 #1294
20
21
22
23
24
25

8 (Pages 26 to 28)

PENINSULA REPORTING   907/283-4429
110 Trading Bay Drive, Suite 100   Kenai, Alaska   99611

bd85c847-7eb2-40a5-b7a3-bf01c2eea132

Exhibit D - Page 8 of 8